UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELANA VERES,

              Plaintiff,                                 Case Number 07-12001

v.                                                 Honorable David M. Lawson

TK HOLDINGS, INC.,

              Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION
## TO STRIKE JURY DEMAND AND PLAINTIFF'S MOTION IN LIMINE AS MOOT

Plaintiff Delana Veres brought this action against her employer, defendant TK Holdings, Inc., for failing to promote her to the position of sales manager because, she believes, the decision was motivated by illegal gender discrimination. The defendant has filed a motion for summary judgment seeking dismissal of all her claims, which are based on Title VII of the Civil Rights Act of 1964 and the Michigan state law counterpart. The defendant also has filed a motion to strike the plaintiff's jury demand alleging that she waived that right through language in her employment application, which she signed. The Court heard oral argument on the motions on March 17, 2008 and now finds that neither direct nor circumstantial evidence supports the plaintiff's claims. Therefore, the Court will grant the motion for summary judgment and dismiss the case. The dismissal renders moot the motion to strike the jury demand, so the Court will not address it.

I.

The plaintiff works as an account manager for the defendant. She has been employed there since 1997, with a two year break between 2003 and 2005, and has remained employed throughout

the pendency of the present lawsuit. In 2006, she applied for a promotion to the position of sales manager, which was ultimately given to a candidate from outside the company, Jeff Johnston.

Defendant TK Holdings, Inc. is part of an international group that develops seatbelts and airbag systems for automobiles. The North American division has an office in Auburn Hills, Michigan and has several marketing groups, including one for General Motors, one for Ford Motor Company, and one for Chrysler. Since August 2006, Kevin Kennedy has been the vice-president of sales for the North America division relating to the domestic accounts. Jeffrey Riggs is the sales director for the Chrysler group. Sales directors are responsible for securing new business with the client. When Kennedy was promoted to vice president, Jim Pearsall, the General Motors sales manager, replaced Kennedy as sales director for General Motors. The plaintiff, a female, competed for the vacancy created by Pearsall's promotion. The job instead went to a male who was hired from outside the company, whom the defendant insists was the best candidate based on the competitors' respective qualifications.

According to Mr. Kennedy, the sales manager (there is one supporting each sales director position) "is responsible for supervising account managers [by giving] day-to-day direction to the account managers on priorities, assistance with difficulties that the account managers might be having." Pl.'s Resp. to MSJ, Kennedy dep. at 38-39. The sales manager has other duties as well, such as helping the sales director at meetings, working with "other departments on assembling quotes, answering questions, providing feedback, and [working] directly with the customer on negotiations for new business." *Ibid.*

Account managers, such as the plaintiff, are "responsible for maintaining records for their assigned programs, mainly the commercial documents, tool orders, piece part purchase orders,

negotiating with customers on engineering changes, [and] working with its internal departments to put together cost estimates in order to quote changes."  Pl.'s Resp. to MSJ, Kennedy dep. 36.

The company has a written policy entitled "Recruitment Procedure for Salaried and Professional Candidates."  According to that document, a search for candidates will follow this progression:

> 1) In speaking with management about the opening, discuss internal talent.  If an internal candidate can be identified, it is important to follow through the screening process to determine if talent and opening are matched;
> 2) Depending on the discretion required for a search (incumbent currently in the job), industry-related contacts should be used to determine if they know of any talent available or "on the market".  Caution should always be taken not to compromise the confidentiality behind the search;
> 3) Advertisement in a local or national newspaper, or a trade publication, is an important tool, but can be costly. . . .

Pl.'s Resp., Ex. A.  Chris Eschker, former Recruitment Manager and current Human Resources Manager for the Auburn Hills facility, testified about this policy.  He interpreted this provision to mean that "[g]enerally" a search begins with internal talent, but "[n]ot always."  Pl.'s Resp. to MSJ, Eschker dep. at 29.  Kennedy testified that he was unfamiliar with this policy and had never seen it before his deposition.  However, Mr. Kennedy stated that "promoting from within I think is always good for morale.  If you can avoid using an outside recruiter, you're probably saving cost."  Pl.'s Resp. to MSJ, Kennedy dep. at 46.

In August 2006, Kennedy was promoted from GM Sales Director to vice president and Pearsall was promoted to GM Sales Director.  Kennedy testified about the promotions from within the company:

> Jim [Pearsall] was being groomed for that position.  When I was hired, I was told that one of my responsibilities was to groom Jim to take my spot because my boss at the time, Bob Kittle, was going to be – wanted to do something else and I was being groomed to take Bob's spot.  So, outside of that, probably the only other one

[example of times when TK Holdings needed to fill an opening], we were looking
for an electronics salesperson, and then we did look internally.  I didn't know there
was an actual written policy on it, but that's typically one of the things we would do
is look internally.

Pl.'s Resp. to MSJ, Kennedy dep. 47.  There are no female sales managers or sales directors

employed in the North American division of TK Holdings, nor have their been since Pearsall or

Kennedy joined the company.

When Pearsall's promotion left open the position of General Motors Sales Manager, he

called the plaintiff at home to let her know about the open position.  Pearsall acknowledged that he

had discussed the plaintiff's career with her in the past and saw a progression to sales manager as

a potential path for her.  The plaintiff made it clear that she was interested in the position.

Initially, Pearsall actively supported the plaintiff for the open position and suggested to

Kennedy that she was the best internal candidate.  Pearsall also told the plaintiff that she was his top

choice, however he testified that she was not, in fact, his top choice.  Kennedy, however, believed

that Scott Hall who was working in engineering would be a better candidate.  Kennedy approached

Hall and mentioned the position to him, but Hall demurred because he did not believe a change from

the engineering department, which had just undergone a major reorganization, would be prudent at

that time.  So Hall was eliminated from consideration.

Ultimately, five candidates were interviewed for the sales manager position.  Three of the

candidates (including Jeff Johnston) were from other companies, and Tim Popa and the plaintiff

were "internal" candidates.  Mr. Johnston ultimately was hired for the position over the plaintiff.

TK Holdings also has a "Checklist of Legal and Illegal Hiring Questions."  The guideline

states that interviewers "may" ask "Do you know of any reason why you might not be able to come

-4-

to work on time, every day? (Caution: permissible only if the question is put to every applicant, regardless of gender." Pl.'s Resp. to MSJ, Ex. J. However, the interviewer is instructed not to ask:

> Are there children at home? How many? Their ages? Who looks after them? If you plant [sic] to have children later on, who will take care of them while you work?

*Ibid.*

The plaintiff was interviewed for the position on October 10, 2006. Kennedy had begun to "look[] . . . at ways to [potentially] hire Jeff Johnston" on October 2, 2006, but testified that the final decision was not made until after all interviews were completed. Pl.'s Resp. to MSJ, Kennedy dep. 111-13. Kennedy said that Johnston was ranked as their top candidate prior to Veres' interview. Pearsall denied that he ranked the candidates prior to the time for a final decision.

Kennedy testified that during the interview, he perceived that travel (which was part of the job) might be a problem for the plaintiff:

> Just her body language, you know, other people asked more about it, well, where am I going to be going, how often do you really think it is. She didn't delve into it I would say as much as some of the other people did. It seemed more like she didn't really want to talk – I don't know that she didn't want to talk about it, but that she just didn't ask as many questions about it, as some of the other candidates did and didn't seem to really explore it as much as I would have anticipated, you know, somebody would on an issue that was really that important.

Pl.'s Resp. to MSJ, Kennedy dep. 115.

Kennedy's other concern was General Motors senior buyer Zulqarnain Mahmood, who apparently displayed some reluctance dealing with women. Kennedy testified that he discussed that topic during the plaintiff's interview, stating:

> You know, we just said hey, you understand that Zulkranan's [sic] still there and, you know, we've always kind of joked about Zulkranan, he doesn't like shaking women's hands and he doesn't like walking next to them and, in fact, his boss is a woman so it's a little bit of a contradiction for him. We just talked about it in generalities. . . . I wasn't concerned about the customer's perception of having a

woman contact them, I was more concerned that Delana would be uncomfortable having to deal with somebody on a day-to-day basis that reacted that way.

*Id.* at 118-19. However, the plaintiff assured the interviewers that she could deal with that individual. Pearsall testified, curiously, that the line of questioning about Mr. Mahmood was to protect TK Holdings from an antidiscrimination lawsuit filed by the plaintiff.

Scott Hall, Pearsall, Julie Hauxwell-Olds, and the plaintiff often went out to lunch together and were "a well-known social kind of group," according to Kennedy. Pl.'s Resp. to MSJ, Kennedy dep. 76-77. When Mr. Pearsall voiced his supported for the plaintiff, Kennedy responded with some caution about Pearsall having to supervise a social friend. Kennedy recounted the exchange as follows:

I said, you know, I said Jim, I know that you and Delana, you know, socialize a little bit together, you know, I'd be concerned that sometimes having a friend work for you can be an issue. He assured me that it wasn't going to be a problem, that he would have no issue with it at all, Delana had worked for him before, he seemed very genuine and credible to me and [it] pretty much ceased to be an issue at that point.

Pl.'s Resp. to MSJ, Kennedy dep. 78. When pressed to compare that attitude about the plaintiff with a similar concern about Pearsall supervising Hall, a male employee, Kennedy explained that "[w]e never got that far with Scott that it had a chance to really be an issue." *Id.* at 77.

Kennedy testified that the plaintiff's then-supervisors, Karl Peterson and Jeffrey Riggs, had no complaints with the plaintiff's work and furnished no negative comments about her to Kennedy, although Riggs may have noted that her salary was high and he was struggling with the budget.

The plaintiff contends that she is qualified for the sales manager position. The record in this case shows that she graduated from Michigan State University with a Bachelors degree in mechanical engineering. The plaintiff's first job after college was at a company called ETA, where she was "on contract" at Ford Motor Company. After that, she worked for three years (1994 to

1997) at an automotive supplier called Sycron as a contract employee at General Motors acting as a validation engineer working on carpet, floor mats, and door trim. From November 1997 to December 2003, the plaintiff was employed with TK Holdings as a senior account manager in the General Motors group. While an account manager, she provided guidance to other account managers by reviewing their work and assigning them work, but she did not discipline or evaluate them. She was paid $55,000 plus a bonus of approximately ten percent of her salary when she started. Her salary when she left in 2003 was $98,000 plus bonus. "[O]ne of the main reasons" that she left the company was "[t]he fast paced schedule after having [her] second child." Pl.'s Resp. to MSJ, Veres dep. at 89. Her children were six years old and four years old in September 2007.

The plaintiff returned to work for the company in 2005 as an account manager in the Chrysler group. It is undisputed that she frequently brought in a large amount of unbudgeted income in that position. In 2007, she was responsible for fifty percent of the unbudgeted income brought in by the Chrysler Group. Her annual salary is $99,000, which makes her the second-highest paid account manager.

According to the plaintiff, in 2005 Bob Kittle (one of her former supervisors) and Kevin Kennedy proposed that she return working part-time, two days one week and three days the next. Mr. Kennedy remembers it differently, claiming that she told them she would prefer to work part time, which was consistent their budget at the time. Kittle had previously supervised the plaintiff, and testified that she would make an excellent account manager. *Id.* at 53-55. The part-time proposal fell through for some reason, and the plaintiff accepted their offer of full-time employment instead. She attempted to negotiate a signing bonus, but was told that the company does not give those out.

The plaintiff's main competition was Johnston. Johnston had earned Bachelors of Science degree in Mechanical Engineering Technology from Lawrence Technological University. He worked at General Motors Technical Center from 1985 through 1991 as a vehicle build technician, project engineer, and release engineer. After a two year stint at TRW Vehicle Safety Systems, he worked at Autoliv from 1993 until he was hired by TK Holdings in 2006. He first worked as an Application/Performance Engineer, then as a program manager, engineering manager, a purchasing manager, and finally a commercial manager for the Ford business unit.

Johnston had four children, aged twenty-one, nineteen, eight and six. He described his interview with Mr. Eschker, the defendant's human resources manager, as follows:

> A: [Mr. Eschker] asked background questions, you know, past employment questions. You know, typical family-type questions.
> Q: What do you mean, "typical family-type questions?"
> A: What is your life like, do you have kids, not that he asked, but I typically talk about my family life.
> Q: So you offered that just as part of a normal conversation?
> A: Yes, a normal conversation that occurs.
> Q: Did he ask you if your children were going to have any impact on your ability to perform your job responsibilities?
> A: Boy, no, not that I recollect.
> Q: Is that something that would have stuck out in your mind?
> A: I would think so.
> Q: Did he ask you if you would have any issues working with a Muslim customer?
> A: No.

Pl.'s Resp. to MSJ, Johnston dep. 25-27. After this interview, Johnston was interviewed by Pearsall:

> Q: Did [Mr. Pearsall] ask you whether or not this travel was going to interfere with your family life?
> A: I don't think he asked if it interfered with my family life, but he asked if there would be any issues with doing a lot of travel, and my answer was, "no."
> . . . .
> A: You brought up about the Muslim, he brought up about the Muslim. [sic]
> . . .
> Q: What did Mr. [Pearsall] say about this individual?

> A: He just asked me if I'd have any problems working with a Muslim religion-type person, and I said, "no," and I knew who he was talking about because I know of Zolton.

Pl.'s Resp. to MSJ, Johnston dep. 28-29.  He also was interviewed by Mr. Kennedy, who does not "recall" asking him whether he had young children.  Pl.'s Resp. to MSJ, Kennedy dep. 94.

Mr. Popa was interviewed the same day as the plaintiff.  Kennedy believes that he did not ask Popa any questions about whether travel would be difficult based on any children he may have.  Kennedy also did not discuss Mr. Mahmood during the interview with Popa.

Kennedy admitted that he had the final say in who was hired.  However, he "value[d]" Pearsall's opinion, and suggested that the decision was probably forty percent Pearsall's and sixty percent Kennedy's.  Pl.'s Resp. to MSJ, Kennedy dep. 133-34.  Kennedy was very impressed with Johnston's successful experience as a manager, and Pearsall and Kennedy each ranked Johnston as the number one candidate, and the plaintiff as number two.  Pearsall told Kennedy that Jeff Johnston was the best candidate for the job based on his prior experience as a manager.

Kennedy testified that he normally does not request references from prospective employees because he does not find them helpful, but in Johnston's case he checked with a person who worked with Johnston at Autoliv.  Pearsall asked Sylvia Salahutdin, a manager at Autoliv, what she thought about Johnston, and she stated that she would pick Johnston.  Johnston was selected as the top choice, and accepted the position in late October 2006.  Since he has started working at TK Holdings, Johnston has been rated as meeting or exceeding expectations, but he has not received a bonus, except for a $3,000 signing bonus.

After Johnston accepted the position, Kennedy testified that he and Pearsall "wanted to try to do something for [the plaintiff] to try to get her ready to be a manager.  Even though she didn't

get this particular position that she would probably be a good candidate for one of the next ones that would come up." Pl.'s Resp. to MSJ, Kennedy dep. at 127. There was a suggestion that a hybrid position could be created with some of the responsibilities of a sales manager, such as supervision duties. However, this has not happened yet. Pearsall called the plaintiff on her cell phone to let her know about this attempt, but she could not talk at the time of the call. Pearsall said that he then "got busy" and did not attempt to raise this possibility again. Later, Pearsall recommended the plaintiff for a potential position at Autoliv and called Autoliv to see if that company had any management opportunities available for Ms. Veres.

The plaintiff contends that Johnston was hired from the outside despite potential legal restrictions on his hiring. Johnston stated on his application that he was not constrained by any non-competition agreements. However, although he had not been aware of any agreement between Autoliv and TK Holdings, he testified that "a month or two after [he] was hired" at TK Holdings, he was told by Chris Eschker and Mr. Pearsall that there was "[s]ome talk" about an agreement "that was going to prohibit the hire" of the Autoliv's employees by TK Holdings. Pl.'s Resp. to MSJ, Johnston dep. at 17-18. On that point, Kennedy testified:

> I was told through our HR group that there had been some pattern of [TK Holdings] people leaving to go to Autoleve [sic], and Autoleve people leaving to go to [TK Holdings], and that at very high levels we had decided that that probably wasn't in the best interest of the company, and that we were going to have, not an agreement, but at least an understanding that we would not actively go pursue the other company's employees.

Pl.'s Resp. to MSJ, Kennedy dep. at 108. Kennedy acknowledged that this "was a potential snag with Jeff Johnston's employment because there was, in fact, this agreement not to hire employees back and forth." *Id.* at 109. Pearsall became aware of the agreement not to hire each other's employees sometime during the hiring process in the fall of 2006. Pearsall saw this as a "hurdle"

to hiring Johnston, and testified that Kennedy had to get permission from a higher manager to hire Johnston. Patrick Giampaolo, TK Holdings's vice president of human resources, submitted an affidavit that states, "There is no agreement or understanding of any type between TKHI and Autoliv (or any other TKHI competitor) not to recruit or hire each other's employees. Def.'s Reply, Ex. 1, Giampaolo Aff. ¶ 4. Over the past two years, TK Holdings has hired six Autoliv engineers and managers.

The plaintiff has complained about her treatment at the company since the lawsuit was filed. She testified that in late 2007, after Johnston was hired, she requested permission to take a training in Dallas, offering to pay for the airfare if TK Holdings would pay for the training. This training was consistent with her goals, and was not available locally. However, the request was rejected by Jeffrey Riggs. Riggs approved a request by Tim Popa for a November 2007 training in Orlando, Florida that cost $1,500, and TK Holdings paid Popa's airfare.

Shortly after the lawsuit was filed, the plaintiff was written up by Riggs for being late for work. Riggs testified that she had come in late nine days within two weeks. Rather than first giving her a verbal warning, he chose to issue a written warning. Other employees have been tardy, but none other than the plaintiff have received a written warning.

The plaintiff filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101-37.2804, contending that the defendant discriminated against her on account of her gender when it gave the sales manager promotion to a man from outside the company. The defendant moved for summary judgment alleging that there is no direct evidence of unlawful discrimination and the plaintiff has not brought forth facts that create a genuine fact question on whether there is

circumstantial evidence of discrimination. The defendant insists that it hired Mr. Johnston because he was the best candidate and more qualified than the plaintiff for the job, and therefore, the plaintiff cannot make out a *prima facie* case, and there is not evidence of pretext.

## II.

The defendant argues that the undisputed facts show that it is entitled to judgment as a matter of law as to all counts of the complaint. A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of

material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir.

2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted).

Title VII of the Civil Rights Act of 1964 renders unlawful an employer's "fail[ure] or refus[al] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ." 42 U.S.C. § 2000e-2. Under the Michigan's Elliott-Larsen Civil Rights Act, "(1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . . " Mich. Comp. Laws § 37.2202.

Claims of gender discrimination under Title VII and the Michigan counterpart can be analyzed together because Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in discrimination cases. *Radtke v. Everett*, 442 Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Co.*, 427 Mich. 505, 525, 398 N.W.2d 368 (1986)). For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases. *See In re Rodriguez,* 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906, 914 (1998).

To withstand summary judgment on her Title VII claim, the plaintiff is required either to "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). In the absence of direct evidence, the plaintiff might prevail if she can establish an inferential case of discrimination under the familiar *McDonnell Douglas* framework. That construct addresses proof of discriminatory intent by circumstantial evidence, and it requires the plaintiff to present a *prima facie* case, whereupon the defendant must offer a legitimate reason for its actions. If the defendant does so, the plaintiff cannot proceed unless she offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination. *See Kline v. Tennessee Valley Authority*, 128 F.3d 337, 342 (6th Cir. 1997).

## A.

The plaintiff contends that the record contains direct evidence that one of the reasons decision maker Kevin Kennedy did not promote the plaintiff was because she is a female. This evidence, she believes, consists of the questions asked of her during the interview about her children affecting her ability to travel. She points out that the other candidates, including Jeffrey Johnston, were not asked these questions. The defendant disputes that point, but the Court will view the evidence in the light most favorable to the plaintiff. The plaintiff also notes that these questions are condemned by 29 C.F.R. § 1604.7 ("Any pre-employment inquiry in connection with prospective employment which expresses directly or indirectly any limitation, specification, or discrimination as to sex shall be unlawful unless based upon a bona fide occupational qualification.") and the EEOC's publication "Enforcement Guidance: Unlawful Disparate Treatment under the federal EEOC laws of workers with care giving responsibilities."

The Court disagrees. "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). "'Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.' *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)." *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007). Direct evidence is a manifestation of actual discriminatory intent by a decision maker, "such as an explicit statement" that the employer was acting on the basis of a protected status. *Imwalle*, 515 F.3d 544.

"Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Statements that require an inference to determine discriminatory motivation are not direct evidence. *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 238-39 (6th Cir. 2005) (in gender discrimination case, interview committee member's statement that they wanted a "grass roots guy" was not direct evidence). Statistical evidence such as the composition of a workforce also does not constitute direct evidence. *Amini*, 440 F.3d at 359.

The interview questions cited by the plaintiff do not allow a fact finder to determine discriminatory intent without drawing inferences. Even if questions about caregiving responsibilities were asked of the plaintiff but not other candidates, no discrimination could be established without having to draw an inference that gender played a role in rejecting the plaintiff

for the promotion.  There is no other evidence in the record that directly establishes the plaintiff's gender to be a motivating factor in Kennedy's employment decision.

## B.

To sustain a discrimination claim at the summary judgment stage absent direct evidence, the plaintiff first must bring forth evidence establishing a *prima facie* case.  "To set forth a prima facie case of discrimination based upon a failure to promote, a plaintiff must show: (1) that [s]he is a member of a protected class; (2) that [s]he applied and was qualified for a promotion; (3) that [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions."  *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003); *see also  McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).

To determine whether two individuals have "similar qualifications" under the fourth prong of the test, the Court must look to objective criteria.

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the . . . employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).  "An exact correlation with the comparable employee is not required."  *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005).  However, "[d]ifferences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated."  *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).

The Sixth Circuit has applied this test in a number of prior cases assessing whether the plaintiff satisfied the elements of a *prima facie* case. For instance, in *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232 (6th Cir. 2005), the court discussed at length a plaintiff's obligation in a failure-to-promote case to show that her qualifications were "similar" to the successful applicant's. The court emphasized that "it is incumbent upon the plaintiff to establish that she and the non-protected person who ultimately was hired for the desired position had similar qualifications." *Id.* at 242. Of course the danger in looking too closely at the relative qualifications at that stage of the analysis is the tendency to conflate proof of the *prima facie* case with proof of the defendant's legitimate, non-discriminatory reason for its action. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 584-85 (6th Cir. 2002); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000). The *White* court seemed to reconcile that concern by limiting the focus of proof at the *prima facie* stage to objective measures, reserving an employer's subjective determinations to the second part (i.e., proof of a legitimate, non-discriminatory justification) of the analysis. *See White,* 429 F.3d at 242-43 & n. 6.

Nonetheless, in concluding that White failed in her effort, the court conducted a point-by-point comparison of the competitors' resumes, noting that the successful applicant (Walker) for the safety manager position

> had seventeen years of experience in security, investigation, safety and crime prevention, as compared with White's seven years of experience. Before she started working at CMHA, White had no experience in security, investigation, safety or crime prevention. In contrast, Walker had served as a military police officer, investigator, and supervisor of security for Faith Mission, Inc., a homeless shelter, prior to being selected for the position at CMHA. Unlike White, whose only investigation experience consisted of three or four domestic or divorce cases, each lasting between one to three weeks, prior to working for CMHA, Walker had conducted countless criminal investigations during his jobs as a military police officer for the Army, private investigator, and at the homeless shelter. White's job

duties at CMHA do not appear to include any supervisory role for other personnel, and she had only performed a supervisory role in connection with a grant project she coordinated, which likewise did not involve supervision of security personnel. By contrast, Walker was responsible for training incoming investigators at the private investigation firm and supervised a staff of twelve to fourteen employees at the homeless shelter. Walker also researched and developed a comprehensive security manual while working at the homeless shelter. Comparing the qualifications of White and Walker, it is clear that Walker has superior experience in material and relevant respects, and therefore, White and Walker cannot be considered similarly qualified for the position, as required to meet the fourth prong of White's *prima facie* burden.

*Id.* at 243-44. The Court rejected the plaintiff's argument that the other candidate was less qualified – or even disqualified – because he had a "criminal background." The court reasoned:

The "criminal background" White refers to arose out of a charge of criminal assault filed against Walker when he was working at the homeless shelter. A man accused Walker of hitting him with a flashlight. Ultimately, Walker pled guilty to a disorderly conduct charge. Despite this charge, there is no genuine issue of fact that White's qualifications were not similar to Walker's. Moreover, the disorderly conduct charge cannot be considered in evaluating pretext, because CMHA was apparently unaware of the disorderly conduct charge at the time that it hired Walker.

*Id.* at 244 n. 7. In *Leadbetter v. Gilley*, the court found that the plaintiff did not meet the fourth prong of the *prima facie* case because he "was not similarly situated to Mizell [the one hired]. Mizell was a better candidate in terms of academic achievement, experience, and work record. She had superior experience managing the General Counsel's office, and she alone was recommended by the University's top brass. Thus, Mizell and Leadbetter were not similarly situated." *Leadbetter*, 385 F.3d at 692.

In the present case, the plaintiff has not shown that she is as qualified as Jeff Johnston because Johnston has more management experience than she does. She takes issue with many of the other comparisons, but there is no evidence that she has managed other employees (to the extent that she is responsible for them, evaluates them, etc.), and Johnston has preformed those tasks in the

areas of programs, engineering, purchasing, and as a commercial manager. In addition, Johnston had extensive experience over seventeen years dealing with TK Holdings' product – airbags – compared to the plaintiff's five years, and several more years' experience with competitors. Proof of similar qualifications is necessary, of course, to support an inference that the employer's choice was based, at least in part, on the gender differences of the competing applicants. The dissimilarity of the qualifications of Johnston when compared to the plaintiff does not support that inference in this case.

The plaintiff also contends that Kevin Kennedy's decision to look for candidates outside the company is a badge of sex discrimination because of the written policy preference of promoting from within. The Sixth Circuit addressed a similar issue in *Cesaro v. Lakeville Community School Dist.*, 953 F.2d 252 (6th Cir. 1992), where the plaintiff alleged that the decision maker's choice to open a vacancy to outside applicants was proof of discrimination since she was the only qualified candidate within the school district. The court rejected the idea that the selection of an otherwise neutral process could establish a violation of Title VII. *Id.* at 255. "Under plaintiff's theory of recovery, she would be entitled to recover even if another woman was hired by the school board under the selection process chosen by Petersen. Surely it was not Congress' intent to extend Title VII to a situation where a neutral selection process through which a woman was hired should give rise to liability to another woman who was not selected because of a decision preliminary to the hiring decision." *Ibid.* The court reasoned:

> Plaintiff's theory also ignores the fact that even if Petersen's motive in opening the application process to outside candidates was discriminatory, a woman would still be selected by the school board if she were the most qualified candidate. It was also possible that the plaintiff would be selected by the school board as the Director of Special Education. At the time Petersen chose the selection process, it was uncertain whether any candidate more qualified than plaintiff would apply.

*Ibid.*

In this case, the plaintiff's similar argument is even less persuasive. Here, the defendant decided to look beyond the internal candidates, which included both male and female applicants. There is no justification for an inference that broadening the scope of the search was a device that permitted the defendant to avoid promoting the plaintiff, and certainly there is no basis of the further inference that the reluctance to promote the plaintiff, if there ever was one, was motivated by her gender.

The plaintiff also points to the difference in the nature of questions posed to her before and during the interview process, which were not asked of male applicants. She cites questions inquiring whether her small children at home would interfere with the travel obligations of the job, and whether she would have difficulty working with a Muslim customer representative that behaved awkwardly toward women. The male applicants were not asked those questions, although Johnston said that he volunteered the information about his children. She also cites a line of questions from Kennedy asking if she would have difficulty working with Pearsall with whom she socialized, and notes that Scott Hall, who was in the same social group, was never asked those questions. Cases from other circuits suggest that discriminatory questions during an interview may be grounds for inferring discrimination. *Barbano v. Madison County*, 922 F.2d 139, 143 (2d Cir. 1990) (questions about whether the plaintiff would get pregnant and quit, or have a spouse who was offended that she was running around the country with other men); *King v. Trans World Airlines*, Inc., 738 F.2d 255, 258 (8th Cir. 1984) ("[I]t is undisputed both that Powell asked appellant pregnancy, childbearing and childcare questions during the interview and that, according to TWA policy, these questions were not asked during the interviews of either male or female job applicants. Appellant's prima

facie case raised the inference that this difference in treatment at the interview stage of the hiring process was at least in part the product of unlawful discrimination."). In this case, however, neither the questions nor the answers suggest that gender played a role in Kennedy's decision to hire the more qualified Johnston instead of the plaintiff. The plaintiff makes the point – which appears undisputed – that Kennedy plainly favored Johnston even before he interviewed the plaintiff for the open position, which indicates that the interview played only a small role in the process. Kennedy explained that the plaintiff expressed some degree of discomfort at the prospect of substantial travel obligations, and his questions were intended to probe the source of her discomfiture. The difference in the questions asked does not supplant the missing element of the plaintiff's *prima facie* case.

The plaintiff also insists that Johnston was not qualified for the position because of an agreement with his former employer that TK Holdings would refrain from poaching employees from that business. To be sure, there is at least a fact question whether there is a hiring ban between TK Holdings and Autoliv, but it does not change the result. Although the defendant submitted an affidavit from a vice president denying the existence of any such agreement, both Kennedy and Pearsall testified that there was such an agreement and it posed a problem to Johnston's hiring. Kennedy Dep. 108-09; Pearsall Dep. 48-49. Yet even if there is an agreement, the Sixth Circuit has found a similar potentially disqualifying barrier – a criminal conviction of one of the candidates vying for a security director job – to not create an inference of discrimination against the backdrop of greater experience. *White*, 429 F.3d at 244 n. 7.

The Court concludes that the plaintiff has not established a *prima facie* case that supports an inference that gender discrimination played a role in the decision to hire an outside candidate

rather than promote the plaintiff to the vacancy within the defendant company. Therefore, the defendant is entitled to judgment as a matter of law.

III.

The Court finds no direct of discrimination, and the plaintiff has not offered facts to support a circumstantial case of gender discrimination under the *McDonnell Douglas* construct.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt #23] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendant's motion to strike the jury demand [dkt #20] is **DENIED as moot**.

It is further **ORDERED** that the plaintiff's motion in limine [dkt # 31] is **DENIED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 24, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 24, 2008.

s/Felicia M. Moses
FELICIA M. MOSES